# EXHIBIT A





UNIVERSAL ELECTRIC CORPORATION

# SALES AGREEMENT
between
UNIVERSAL ELECTRIC CORPORATION
(hereinafter called the Company)
&

Baldwin Technologies, INC.
AUTHORIZED REPRESENTATIVE.
(hereinafter called the Representative)

Made this 1st day of December, 1999

The above parties do covenant and agree as follows:

1. The Company hereby appoints the Representative Company, doing business at the primary location of 4907 Niagra Road Suite 206 College Park MD 20740, as its exclusive representative in the territory described below, and for the product(s) listed under the terms and conditions hereinafter stipulated. The territory and product(s) being assigned by the Company to the Representative shall be the following:

| **TERRITORY** | **PRODUCTS** |
|---|---|
| Entire State of Maryland, Virginia, & The District of Columbia | Starline Plug-In Busway |

2. The Representative shall solicit orders for, and use his best efforts to promote the sale of the Company Products in the Territory and to contact the principal manufacturing and industrial accounts in the Territory with sufficient regularity to assure continuity of business and to assure that such accounts have all necessary information concerning their use of and potential need for the Company Products.



3. The Representative shall have no authority to contract for the Company in any manner, and shall have no authority to accept any order on behalf of the Company. All orders for the Company Products solicited by the Representative shall be at the prices established by the Company. All orders obtained by the Representative shall be submitted to the Company for acceptance or refusal. The Representative shall furnish the Company with copies of significant correspondence and quotations pertaining to the Company Products.

4. In general, the Garment Industry shall be covered by the Company with all existing accounts excluded from this agreement. However, the Representative is encouraged to actively pursue new accounts in this industry. It shall be the responsibility of the Representative to notify the Company of the development of new accounts prior to order entry.

5. The Representative hereby agrees that during the life of this Agreement, he will not handle any competitive merchandise, or promote the sale of any such merchandise without written approval of the Company. The Representative is to hold in the strictest confidence during the term of this Agreement and at all times thereafter, any and all information of confidential nature obtained regarding the Company business or affairs, including but not limited to customer list, customers prices, data regarding their design and/or methods of manufacture of Company Products. The Representative will not disclose in any manner directly or indirectly such information to any entity, person, partnership, or Corporation.

6. The Representative will be paid a commission on all acceptable orders shipped into his territory. The Company may, however, in any given instance, elect to compensate the Representative for sales to accounts otherwise excluded, without in any way waiving its right to exclude other such accounts, or its right to cease payment thereafter with respect to sales excluded herein. The Company reserves the right to exclude future accounts not previously listed providing the Representative is notified in writing of its intention.

7. The commission rate shall be as follows:
Except as provided in paragraph 15 of this Agreement, the Company agrees to pay a commission rate of 10% (0.10) to the Representative, on the product invoice price of any or all orders in the Representative territory and accepted by the Company in accordance with the Company Published Price Lists in effect at the time or to subsequent schedules if agreed to in writing by both parties. The commission shall be calculated on the net amount of the invoice after deducting allowances, transportation charges, taxes and cost of collection, if any.

8. Further, the Company agrees to pay an additional commission of 2% (0.02) to the Representative following the same conditions as outlined above for all orders exceeding the previous highest calendar year sales volume. This additional commission shall be paid in one lump sum following the close of the calendar year.

9. Further, the Company agrees to pay an additional commission of 3% (0.03) to the Representative following the same conditions as outlined above for all orders exceeding the prearranged Sales Volume Target based on growth for the entire calendar year. The prearranged Sales Volume Target shall be determined for each calendar year by the Company with written notification provided to the Representative during the last month of the previous calendar year.

10. No commission shall be payable with respect to Company Products rejected or returned by customers or unpaid customer invoices. It is understood that the Company may for any reason cancel or reject, any or all orders, or may for any reason consent to the cancellation of any orders, in whole or in part after its acceptance by the Company, and in all such cases the Company shall not be liable to the Representative for the commission with respect to the order or orders. Commissions shall be payable by the tenth (10th) day of the month following the month the payment is received by the Company.

11. The Company and Representative recognize that parties in different territories may contribute to the sale of the Company Products. Therefore, the following split commissions are in effect::

    1/4 of commission to the area where the order was generated

    1/2 of commission to the area where the order was specified/engineered.

    1/4 of commission to the area where the material is shipped. The Representative is to visit or call first-time customers of a complete system installed in his territory to make sure the customer is satisfied, and inform the Company to the satisfactory condition.

12. There will be no commission splits on orders under $100.00 net. The Company will determine ordering and shipping locations by way of Territory Zip Codes as defined in this Sales Agreement. It shall be the responsibility of the Representative to notify the Company of specification/engineering credit due prior to order entry. It is assumed that shipping and installation location are one in the same. However, in some cases the shipment location may not be where the Company product(s) are ultimately installed. It is the responsibility of the Representative to notify the Company of any change in installation location prior to order entry. The Company shall have final authority for determining all commission splits.

13. The Company will provide the Representative without charge and in reasonable quantities all necessary samples, promotional material, and such other items as it feels will assist in the promotion of its business. The Representative shall not be entitled to reimbursement for any expenses incurred by him in the course of promoting the Company's business

14. It is understood that the Representative and its employees are independent contractors and are not employees of the Company. The Representative firm will



be listed as an additional insured party under the Company business and product liability insurance package.

15. This Agreement shall become effective December 1st, 1999 and upon signing by both parties, and will remain in force for a period of one year, except that during the first year either party may terminate it at any time by giving the other thirty day notice in writing of its intention to terminate. If this Agreement is not cancelled by either party during the first year, it will continue from year to year thereafter, unless or until either party gives to the other ninety (90) days notice in writing of intention to terminate.

16. Upon any termination of this Agreement, the Representative shall receive commissions, upon shipment, for any order which are accepted by the Company prior to the effective date of termination.

17. It is mutually agreed that this writing contains the whole agreement between the parties. In witness whereof the parties have executed this Agreement.

UNIVERSAL ELECTRIC CORPORATION

_____       _____12-2-99_____
Joel C. Ross, President                                        Date

Authorized REPRESENTATIVE COMPANY

_____ Pres,        _____12-8-99_____
Mark Baldwin, Principle                                        Date

WHITEHEAD / OCTET                    BRAZIL
                                     1/22/01

OPTIONS: LIEBERT UPS — HANDLE TRANSACTION

a) EXPORT DISTRIBUTORS: NJ + NY
b) GRAYBAR
c) MIAMI
d) LIEBERT

B100    2000 ~~~~~ ft.
FUSE    DUAL   DUPLEX


MARK BALDWIN — MITSUBISHI REP IN BRAZIL

Need whip lengths.

# Notes from meeting with Whitehead Electric Company
## OCTET Brazil Project
## 01-18-01

Attendees:   Mr. Larry Doyle – Universal Electric Corporation (UEC)
Ms. Lori Baldwin – NuSouth Technologies
Mr. Tom Shelton – Whitehead Electric Company (WEC), Chief Estimator
Mr. Ken Freeman – Whitehead Electric Company, Project Manager
Mr. Pete Foster – Whitehead Electric, Management

Ken Freeman explained the following points:

- WEC is the facilitator for the OCTET Brazil data center project
- OCTET is a European conglomerate that owns utilities; this is their third data center
- OCTET issues the purchase orders and WEC passes them to us (the letter of intent, letter of credit will be included)
- Holder Construction is the construction manager
- Holder hired a general contractor and electrical contractor in Brazil
- WEC will do their own take off of a Busway Bill of Materials from the drawings, but they have not started to do it yet, they will compare it to the quote from UEC

Larry and Ken agreed to have a quote by the end of next week (January 26, 2001) for the following:

- Materials pricing
- Value Added Taxes
- Freight costs
- Customs and duty in Brazil

Ken stated that he would forward the info for the freight company he is using, the RFP and electrical drawings to Larry and Lori on Friday January 19, 2001.

Ken explained the schedule as follows:

- The drop dead date for on site delivery of Busway is April 1, 2001
- He would like to have it onsite by Mid March 2001
- The PDUs arrive from Liebert on May 1st at the site
- An executive from UEC must sign the quotation assuring timely delivery onsite (per the RFP)
- Ken advised us to estimate delivery based on overland to Miami, then 4 weeks by boat to Brazil and then include customs and other delays in country.
- The site will be up and running on June 1, 2001