**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

UNIVERSAL ELECTRIC    :
CORPORATION,     :
    Plaintiffs    :   No. 2:17-cv-00842
           :
    v.      :   (Judge Kane)
           :
MARK H. BALDWIN, et al.,  :
    Defendants   :

## MEMORANDUM

Before the Court are two motions to dismiss Plaintiff Universal Electric Corporation's

amended complaint.  (Doc. Nos. 35, 37.)  For the reasons that follow, the Court will grant in part

and deny in part the motions to dismiss.

## I.  BACKGROUND

### A.  PROCEDURAL BACKGROUND

On June 26, 2017, Plaintiff Universal Electric Corporation ("UEC"), initiated the above-

captioned action by filing a complaint against Defendants Mark H. Baldwin ("Baldwin"),

Baldwin Technologies, Inc. ("BTI"), Busway Solutions, LLC ("Busway Solutions"), Direct

Power Technologies, Inc. ("Direct Power"), and Engineered Products Company doing business

as PDU Cables ("PDU Cables"), in the United States District Court for the Western District of

Pennsylvania.  (Doc. No. 1.)  PDU Cables filed a motion to dismiss UEC's complaint pursuant to

Federal Rule of Civil Procedure 12(b)(6) and a brief in support of its motion to dismiss on

August 30, and August 31, 2017, respectively.  (Doc. Nos. 18, 20).  On September 8, 2017,

Baldwin, BTI, and Direct Power, and Busway Solutions filed a motion to dismiss the complaint

(Doc. No. 25), together with a supporting brief (Doc. No. 26).  On September 25, 2017, UEC

filed a seven-count amended complaint, to which it appended approximately 171 pages of

corresponding exhibits.[1] (Doc. No. 33.) The above-captioned action was then assigned to the undersigned pursuant to 28 U.S.C. § 292(b) for all further proceedings.

On October 9, 2017, PDU Cables filed a motion to dismiss the amended complaint pursuant to Rule 12(b)(6), and a brief in support of its motion. (Doc. Nos. 35, 36.) The next day, Defendants Baldwin, BTI, Direct Power, and Busway Solutions[2] collectively filed a motion to dismiss the amended complaint under Rule 12(b)(6), or alternatively, for a more definite statement pursuant to Federal Rule of Civil Procedure 12(e), and a supporting brief. (Doc. Nos. 37, 38.) UEC submitted briefs in opposition to Defendants' motions to dismiss on October 30, and 31, 2017. (Doc. Nos. 39, 40.) Having been fully briefed, Defendants' motions to dismiss the amended complaint are now ripe for disposition.

B.     FACTUAL BACKGROUND[3]

UEC is a family-owned company that "designs and manufactures products for the electrical power distribution industry" (Doc. No. 33 ¶ 1), and "services the data center, retail,

---

[1] In light of UEC's subsequent filing of an amended complaint in this matter, the Court will deny as moot the pending motions to dismiss the complaint filed on August 30 and September 8, 2017. (Doc. Nos. 18, 25.) See Calloway v. Green Tree Servicing, LLC, 599 F. Supp. 2d 543, 546 (D. Del. 2009) ("Defendant's motion to dismiss is responsive to plaintiffs' original complaint. As the amended complaint has superseded the original, defendant's motion to dismiss has become moot."); see also Bancoult v. McNamara, 214 F.R.D. 5, 13 (D.D.C. 2003) ("Because the original complaint now is superseded by the amended complaint, the court denies without prejudice all pending motions pertaining to the original complaint.").

[2] The Court notes that Busway Solutions has joined in the motion filed by Defendants Baldwin, BTI, and Direct Power as to Counts I, IV, V, and VI. (Doc. No. 37 at 1.)

[3] The following factual allegations are taken directly from UEC's amended complaint and the exhibits attached thereto, and are accepted as true for purposes of this motion to dismiss. See Schuylkill Energy Res., Inc. v. Pa. Power & Light Co., 113 F.3d 405, 417 (3d Cir. 1997) (explaining that "[w]hen reviewing a Rule 12(b)(6) dismissal, [the court] must accept as true the factual allegations in the complaint and all reasonable inferences that can be drawn from them"). The Court limits its discussion of the factual background of this case only to those factual allegations necessary for deciding the motions presently before the Court.

health care, higher education, and industrial markets across the United States" (id. ¶ 16). UEC carries two different power distribution product lines: the STARLINE Track Busway and the STARLINE Plug-In Raceway. (Id. ¶¶ 16-17.) The STARLINE Track Busway includes a line of products known as the 'T5 Series'" ("STARLINE T5 Series Track Busway"). (Id. ¶ 17.) The STARLINE Track Busway also offers several plug-in unit options, such as the STARLINE Tap-Off Box, which "connects to UEC's STARLINE T5 Series Track Busway." (Id. ¶ 18.) To sell its products, UEC maintains a network of sales representatives assigned to certain geographical territories. (Id. ¶ 21) UEC's sales representatives have access to "information related to the design, safety, efficacy, pricing, and marketing of UEC products, as well as UEC's special business techniques, market analysis forms, software programs, customer lists, and manufacturing process[es]" so that they can market UEC's products effectively. (Id. ¶ 22.) Due to the confidential nature of this information, UEC requires its sales representatives to sign a sales agreement that, inter alia, restricts the use and disclosure of that confidential information. (Id. ¶ 23.)

On or about March 1, 1999, UEC and BTI[4] entered into a Sales Agreement, whereby UEC designated BTI as the authorized and exclusive sales representative for the State of Maryland, the Commonwealth of Virginia, and the District of Columbia. (Id. ¶ 24; Doc. No. 33-1.) "Pursuant to the 1999 Agreement, BTI agreed to 'hold in the strictest confidence during the term of the Agreement, and at all times thereafter, any and all information of confidential nature obtained regarding [UEC] business or affairs . . . .'" (Doc. No. 33 at ¶ 25.) On or about March

_____

[4] Baldwin is the president of BTI and Direct Power, registered corporations organized and existing under the laws of the State of Maryland with principal places of business in the State of Maryland. (Doc. No. 33 ¶¶ 3-10.) Baldwin is also a member of Busway Solutions, a limited liability company organized and existing under the laws of the State of Maryland with its principal place of business in the State of Maryland. (Id.) As alleged in the amended complaint, Baldwin is the "driving force behind each" company. (Id. ¶ 1.)

1, 2013, UEC and BTI entered into a second Sales Agreement (the "2013 Agreement"), that

"supersede[d] all previous contracts" between UEC and BTI.  (Id. ¶ 30; Doc. No. 33-2 at 1.)  The

2013 Agreement, signed by Baldwin in his capacity as president of BTI, memorialized BTI's

intent to continue serving as a UEC sales representative in the territory consisting of the State of

Maryland, the Commonwealth of Virginia, and the District of Columbia with respect to

"products contained within the following product families: STARLINE Track Busway [and]

STARLINE Plug-in Raceway."  (Doc. No. 33-2 at 3-11.)  Significantly, the 2013 Agreement

contained the following provisions:

**4.**     **Trade Secrets; Competitive Merchandise; Restrictive Covenant**

A.   With respect to [UEC's] special business techniques, market analysis, forms, software programs, customer list[s], and all other information regarding manufacture or distribution of [UEC's] products, [BTI] acknowledges that all such information: (i) belongs to [UEC]; (ii) constitutes specialized and highly confidential information not generally known in the industry; [and] (iii) constitutes trade secrets of [UEC]. Accordingly, [BTI] recognizes and acknowledges that it is essential to [UEC] to protect the confidentiality of this trade information.

B.   [BTI] agrees to act as a [t]rustee of [UEC's] confidential trade information and will hold such information in trust and confidence for [UEC's] sole and exclusive use and benefit.

C.   During the term hereof and for thirty-six (36) months thereafter, [BTI] shall not disclose such confidential trade information to any person, firm, association, or other entity for any reason or purpose whatsoever, unless such information has already become common knowledge or unless [BTI] is required to disclose the information by judicial process.

D.   During the term of this Agreement, [BTI] shall not, directly or indirectly, enter into, or in any manner take part in, any business, profession, or other endeavor which competes with [UEC] in the sale of its merchandise (including any products that [UEC] may add to its product line during the term of this Agreement). [BTI] shall not so compete either as an employee, agent, independent contractor, owner, or otherwise.

(Id. at 7-8.)

On March 30, 2014, UEC terminated the 2013 Agreement. (Doc. No. 33 ¶ 31; Doc. No. 33-3.) Consequently, the parties entered into a Settlement Agreement and General Release on or about July 8, 2014 (the "Settlement Agreement"), which resolved to "settle any disputed amounts due to BTI . . . including without limitation, certain commissions to be paid by UEC to BTI on orders which were taken, but not shipped[,] during the 30 day notice period prior to termination" of the 2013 Agreement. (Doc. No. 33 ¶ 33; Doc. No. 33-4.) As a condition of settlement, the parties were prohibited from making "disparaging or negative comments regarding the other party . . . to any person or entity." (Doc. No. 33 ¶ 34; Doc. No. 33-4 at 3.)

According to UEC, Defendants' conduct leading up to the termination of the 2013 Agreement and thereafter violated the 2013 Agreement and the Settlement Agreement in myriad respects, giving rise to several of the claims brought in this action. In the 36-month period following the effective termination date of the 2013 Agreement, Baldwin, acting on behalf of BTI, and in concert with other Defendants, disclosed certain confidential trade information regarding the "design, safety, and efficacy of UEC's STARLINE products" in applying for and obtaining a patent. (Doc. No. 33 ¶¶ 36, 43.) On April 2, 2014, merely three days after the termination of the 2013 Agreement went into effect on March 30, 2014, without UEC's knowledge or consent, Baldwin filed a provisional patent application, entitled "BUSWAY OUTPUT BOX GUIDE/INHIBITOR SYSTEM FOR INSERTION AND REMOVAL OF A BUSWAY OUTPUT BOX," with the United States Patent and Trademark Office ("USPTO"). (Id. ¶¶ 37, 38.) On March 10, 2015, Baldwin filed a non-provisional patent application identifying himself as the "inventor," and Busway Solutions as the "owner" or "assignee" that was based on, and claimed priority to, his earlier provisional patent application. (Doc. No. 33-5.) On July 5, 2016, Busway Solutions, as assignee, was issued United States Patent No. 9, 385, 517

(the "'517 Patent"), based on the provisional and non-provisional patent applications. (Id. ¶ 41; Doc. No. 33-6.) The '517 Patent asserted fourteen claims involving various components of a guide/inhibitor system for insertion and removal of rotational style output boxes for busway bars aimed at "enhancing safety in busway bar power distribution systems." (Doc. No. 33 ¶ 42.) UEC insists that the safety concerns referenced by the '517 Patent relating to certain UEC products that Baldwin sold through BTI for fifteen years, namely, "power distribution power heads, mast heads, plug-in units, [and] electrical power outlet units," were "untrue and unsubstantiated." (Id. ¶¶ 42, 43.) UEC further believes that BTI, through Baldwin and for the benefit of Busway Solutions, "must have started working on inventions covered by the '517 Patent during the term of the 2013 Agreement," in violation of several provisions contained therein. (Id. ¶ 46.)

On December 22, 2016, Busway Solutions filed another non-provisional patent application that asserted twenty claims (Application No. 15/185,816, herein referred to as the "'816 Application"), and claimed priority to a provisional application filed on June 17, 2015 entitled, "SYSTEMS, METHODS, AND APPARATUS USEFUL FOR BUSWAY POWER DISTRIBUTION." (Id. ¶¶ 48, 49; Doc. No. 33-7.) The '816 Application again referenced safety issues with UEC's STARLINE products and cited as a basis for patentability the need "for improved power distribution power heads, mast heads, plug-in units, or electrical power outlet units"— the same products designed and manufactured by UEC that Baldwin sold for fifteen years. (Id. ¶¶ 51, 54.)[5] UEC alleges that, "in filing . . . the non-provisional '816 [A]pplication,

---

[5] Notably, on May 19, 2017, the USPTO rejected nineteen of the twenty claims asserted in the '816 Application. (Id. ¶ 55, Doc. No. 33-8.) Several claimed inventions were rejected under 36 U.S.C. § 102(a)(2) as being anticipated by prior UEC patents (e.g., United States Patent No. 8,664,530, referred to herein as the "Ross '530 Patent;" United States Patent No. 9,379,502, referred to herein as the "Davidson '502 Patent'"). (Doc. No. 33-8.) Most of the '816

BTI, through Baldwin and for the benefit of Busway Solutions, disclosed UEC's confidential trade information, including information regarding the safety and efficacy of UEC's STARLINE products." (Id. ¶ 52.)

UEC also asserts that, in conjunction with the patent application process, Baldwin "created and implemented a campaign to undermine the confidence of actual and prospective UEC customers in the safety and security of UEC's STARLINE products by advertising," through BTI, Busway, and DPTI, and in concert with PDU Cables, "that UEC's products are not safe for the customers' employees or equipment." (Id. ¶ 62.) For example, on March 15, 2017, PDU Cables, a manufacturer and supplier of power-distribution cable assemblies, announced that it would be the exclusive distributor of Busway Solutions tap-off boxes, a "safer and superior tap-off box to the standard OEM[6] plug-in's offered for 'U' shaped open channel track busway, like S[TARLINE]'s T5 Series Busway Track System" (herein referred to as the "March 15 Announcement"). (Id. ¶ 64; Doc. No. 33-11.) The March 15 Announcement also provided the following:

> Featuring a re-engineered plug mast with larger paddle surface area, Busway Solutions tap[-] off boxes are designed for increased safety, superior performance, and easier installation. The internal conductors have been upgraded to #8AWG wires on all boxes, with a 6#AWG wiring option for high density and multi-circuit applications.
>
> Each Busway Solutions tap-off box comes standard with two mounting taps for securer attachment along with the patent inhibitor (mounting alignment bracket) to assure proper installation and de-installation.

---

Application's claims, however, were rejected under 35 U.S.C. § 103, which provides that a patent "may not be obtained . . . if the differences between the claimed invention and the prior art are such that the claimed invention as a whole would have been obvious before the effective filing date of the claimed invention to a person having ordinary skill in the art to which the claimed invention pertains." (Id.)

[6] According to the complaint's allegations, OEM refers to "Original Equipment Manufacturer." (Id. ¶ 64.)

(Doc. No. 33-11.)  UEC reasons that because "Busway Solutions is the only manufacturer – other than UEC itself – that makes a tap-off box with the unique geometry required to be electromechanically compatible with UEC's STARLINE T5 Series Track Busway," the March 15 Announcement communicated to actual and prospective customers that Busway Solution's tap-off box is a safer alternative to the UEC's STARLINE Tap-Off Box.  (Id. ¶ 74.)

In addition to the March 15 Announcement, UEC asserts thatDefendants produced a "steady drumbeat" of false and disparaging representations on "PDU Cables' website, a subsequent February 27, 2017 press release, . . . a brochure published by PDU Cables and Busway Solutions,"  and through e-mail advertisements that UEC contends were directed at UEC's STARLINE products and communicated to "customers in the industry . . . that UEC's STARLINE Tap-Off Box has numerous safety concerns and that the Busway Solutions tap-off box is safer than UEC's STARLINE Tap-Off Box" (Id. ¶¶ 80-85; Doc. Nos. 33-12, 33-13, 33-14.)  UEC alleges that "[u]pon information and belief, Baldwin, on his own behalf and working in concert with BTI, Direct Power, and Busway Solutions, was involved in crafting at least some, if not all, of this content on the PDU Cables website and press release."  (Id. ¶ 90.)  UEC asserts that "the false, misleading, and disparaging statements made by Defendants regarding the safety of UEC's STARLINE Tap-Off Boxes have created uncertainty and confusion in the marketplace."  (Id. ¶ 104.)

Finally, UEC alleges that Baldwin, acting through or on behalf of one or more Defendants, made "false and misleading statements to at least one end-user in an attempt to divert business from UEC" (id. ¶ 97; Doc. No. 33-17), and used UEC confidential trade information . . . to misappropriate UEC's business opportunities with existing UEC customers" (id. ¶ 126).

## II.    STANDARD OF REVIEW

Rule 12(b)(6) of the Federal Rules of Civil Procedure authorizes a defendant to move to dismiss a complaint for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  The legal standards governing pleading practice in federal court have shifted to a "more heightened form of pleading, requiring a plaintiff to plead more than the possibility of relief to survive a motion to dismiss."  Fowler v. UPMC Shadyside, 578 F.3d 203, 210 (3d Cir. 2009).  To avoid dismissal, all civil complaints must set out "sufficient factual matter" to show that the claim is facially plausible.  Id.  The plausibility standard requires more than a mere possibility that the defendant is liable for the alleged misconduct.  Indeed, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – 'that the pleader is entitled to relief.'"  Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009) (citing Fed. R. Civ. P. 8(a)(2)).  Factual allegations must be enough to "raise a right to relief above the speculative level."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007).

The United States Court of Appeals for the Third Circuit has identified the following steps a district court must take when evaluating the sufficiency of a complaint's allegations as tested against a Rule 12(b)(6) motion: (1) identify the elements a plaintiff must plead to state a claim; (2) discard any conclusory allegations contained in the complaint "not entitled" to the assumption of truth; and (3) determine whether any "well-pleaded factual allegations" contained in the complaint "plausibly give rise to an entitlement to relief."  See Santiago v. Warminster Twp., 629 F.3d 121, 130 (3d Cir. 2010) (citation and quotation marks omitted).

In evaluating whether a complaint fails to state a claim upon which relief may be granted, the court must accept as true all factual allegations in the complaint and construe all

reasonable inferences to be drawn therefrom in the light most favorable to the plaintiff.  See In re

Ins. Brokerage Antitrust Litig., 618 F.3d 300, 314 (3d Cir. 2010).  A court "need not credit a

complaint's 'bald assertions' or 'legal conclusions' when deciding a motion to dismiss," Morse

v. Lower Merion Sch. Dist., 132 F.3d 902, 906 (3d Cir. 1997), and must disregard any

"formulaic recitation of the elements of a cause of action."  Twombly, 550 U.S. at 555.

Additionally, a court may not assume that a plaintiff can prove facts that the plaintiff has not

alleged.  Associated Gen. Contractors of Cal. v. Cal. State Council of Carpenters, 459 U.S. 519,

526 (1983).  In deciding a Rule 12(b)(6) motion, the court may consider, in addition to the facts

alleged on the face of the complaint, any exhibits attached to the complaint, "any 'matters

incorporated by reference or integral to the claim, items subject to judicial notice, [and] matters

of public record.'"  Buck v. Hampton Twp. Sch. Dist., 452 F.3d 256, 260 (3d Cir. 2006) (quoting

5B Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure, § 1357 (3d ed. 2004)).

## III.    DISCUSSION

UEC's amended complaint sets forth the following seven counts against Defendants:

false advertising in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), against

all Defendants (Count I); breach of the 2013 Agreement against BTI (Count II); breach of the

Settlement Agreement against BTI (Count III);  breach of fiduciary duty and equitable

assignment against Baldwin and Busway Solutions (Count IV); common law unfair competition

against all Defendants (Count V); trade disparagement against all Defendants (Count VI); and

false designation of origin against Busway Solutions and PDU Cables (Count VII).  (Doc. No. 33

at 26, 27, 29, 30, 31, 33.)

Defendants Baldwin, BTI, Direct Power, and Busway Solutions move to dismiss all Counts of the amended complaint[7] (Doc. No. 37), and Defendant PDU Cables moves to dismiss Counts I, V, VI, and VII of the amended complaint, the only Counts asserted against it (Doc. No. 35).

A.   <u>FALSE ADVERTISING IN VIOLATION OF SECTION 43(A) OF THE LANHAM ACT (COUNT I) & UNFAIR COMPETITION (COUNT V)</u>[8]

Count I of the amended complaint asserts a claim of false advertising in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).  Section 43(a) of the Lanham Act "prohibits false advertising in interstate commerce."  <u>Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharm. Co.</u>, 290 F.3d 578, 586 (3d Cir. 2002).  It provides, in pertinent part:

> (1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—
>
> > (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,
>
> shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

---

[7] These Defendants have alternatively moved for a more definite statement under Rule 12(e). However, the Court does not find that UEC's amended complaint is so "vague or ambiguous that [Defendants] cannot reasonably prepare a response."  Fed. R. Civ. P. 12(e).  Accordingly, the Court will deny the request.

[8] UEC asserts a claim of unfair competition against all Defendants in Count V of the amended complaint that is premised on the same allegations giving rise to its false advertising claim under the Lanham Act.  A cause of action for unfair competition under Pennsylvania law is "identical to [that asserted under] the Lanham Act, without the federal requirement of interstate commerce," <u>R.J. Ants, Inc. v. Marinelli Enters., LLC</u>, 771 F. Supp. 2d 475, 489 (E.D. Pa. 2011). Accordingly, the Court's evaluation of the legal sufficiency of Count I of the amended complaint applies with equal force to Count V of the amended complaint.

15 U.S.C. § 1125(a).  To prevail on a claim of false advertising, a plaintiff must plead and eventually prove the following:

> 1) that the defendant . . . made false or misleading statements as to his own product [or the plaintiff's product]; 2) that there is actual deception or at least a tendency to deceive a substantial portion of the intended audience; 3) that the deception is material in that it is likely to influence purchasing decisions; 4) that the advertised goods traveled in interstate commerce; and 5) that there is a likelihood of injury to the plaintiff in terms of declining sales, loss of good will, etc.

Warner–Lambert v. Breathasure, 204 F.3d 87, 91-92 (3d Cir. 2000) (citing Johnson & Johnson–Merck Consumer Pharm. Co. v. Rhone–Poulenc Rorer Pharm., Inc., 19 F.3d 125, 129 (3d Cir. 1994)).

Defendants present several grounds for dismissal of Count I of the amended complaint, two of which warrant discussion.  (Doc. Nos. 36 at 8; 38 at 5.)  First, Defendants contend that the commercial statements UEC characterizes as false advertising amount to nothing more than non-actionable puffery, and thus cannot give rise to a viable false advertising claim.  (Doc. Nos. 36 at 8; 38 at 7.)  Second, Defendants argue alternatively that UEC has failed to plead a likelihood of commercial injury with requisite specificity.[9]  (Doc. Nos. 36 at 12; 38 at 8.) The Court considers

---

[9] Defendants Baldwin, BTI, Direct Power, and Busway Solutions also move to dismiss Count I of the amended complaint on the basis that the challenged statements giving rise to this action do not constitute an "advertisement" or "promotion" as contemplated by the Lanham Act.  (Doc. No. 38 at 5.)  The Court is unpersuaded by Defendants' argument that the statements at issue do not qualify as an "advertisement."  A commercial advertisement or promotion "consists of (1) commercial speech; (2) by a defendant in commercial competition with the plaintiff; (3) designed to influence customers to buy the defendant's products; (4) that is sufficiently disseminated to the relevant purchasing public to constitute advertising or promotion within the industry." Synygy, Inc. v. Scott-Levin, Inc., 51 F. Supp. 2d 570, 576–77 (E.D. Pa. 1999) aff'd sub nom. Synygy, Inc. v. Scott-Levin, 229 F.3d 1139 (3d Cir. 2000); see Advanced Fluid Sys., Inc. v. Huber, 28 F. Supp. 3d 306, 334 (M.D. Pa. 2014) (explaining that "purely private communications and other messages that are not publicly disseminated" do not qualify as "advertising" or "promotion").  Here, UEC has clearly pled that false statements pertaining to the safety of Busway Solutions' tap-off box design as compared to its competitor's products were publically disseminated by Baldwin, BTI, Busway Solutions, Direct Power, and PDU Cables

these arguments in connection with its evaluation of the allegations supporting Count I of the amended complaint in turn.

### 1. Whether the challenged advertisements are non-actionable puffery

To satisfy the first element of a false advertising claim under Section 43(a) of the Lanham Act, a plaintiff must demonstrate that the representation of fact is either (1) literally false or (2) literally true or ambiguous, but misleading to consumers.  Santana Prod., Inc. v. Bobrick Washroom Equip., Inc., 401 F.3d 123, 136 (3d Cir. 2005) (citing Novartis Consumer Health, Inc., 290 F.3d at 586 ("Liability [under the Lanham Act] arises if the commercial message or statement is either (1) literally false or (2) literally true or ambiguous, but has the tendency to deceive consumers.")).

Essential to this inquiry is "whether the challenged statement is one of fact—actionable under [S]ection 43(a)—or one of general opinion—not actionable under [S]ection 43(a)."  Pizza Hut, Inc. v. Papa John's Int'l, Inc., 227 F.3d 489, 495-96 (5th Cir. 2000).  "Only statements of fact capable of being proven false are actionable under the Lanham Act."  Parker v. Learn Skills Corp., 530 F. Supp. 2d 661, 679 (D. Del. 2008) (citation omitted).  By contrast, mere "puffery," a term of art loosely defined by the Third Circuit as an "exaggeration or overstatement expressed in broad, vague, and commendatory language" on which no reasonable buyer would rely does not give rise to a claim for false advertising under the Lanham Act.  Castrol Inc. v. Pennzoil Co., 987 F.2d 939, 945 (3d Cir. 1993).  In evaluating whether an alleged misrepresentation is a statement of fact as opposed to mere puffery, the United States Court of Appeals for the Ninth

---

through an advertising campaign consisting of a March 15 Announcement, content posted on PDU Cables' website, a brochure published by PDU Cables and Busway Solutions, and a press release issued by PDU Cables.  These publications clearly fall within the scope of a commercial advertisement or promotion.  See Enzo Life Scis., Inc. v. Digene Corp., 295 F. Supp. 2d 424, 428 (D. Del. 2003) ("[T]he Court finds that the press releases constitute commercial advertising or promotion within the industry, because they were commercial speech.").

Circuit's decision in <u>Newcal Industries, Inc. v. Ikon Office Solution</u>, 513 F.3d 1038, 1053 (9th Cir. 2008), is instructive:

> A statement is considered puffery if the claim is extremely unlikely to induce consumer reliance. . . . [T]he difference between a statement of fact and mere puffery rests in the specificity or generality of the claim. The common theme that seems to run through cases concerning puffery in a variety of contexts is that consumer reliance will be induced by specific rather than general assertions. Thus, a statement that is quantifiable, that makes a claim as to the specific or absolute characteristics of a product, may be an actionable statement of fact while a general, subjective claim about a product is non-actionable puffery.

<u>Id.</u>

Having tested the alleged false statements of fact set forth in the amended complaint and attached exhibits against the foregoing authority, the Court cannot conclude at this juncture of the proceedings that the challenged statements amount to non-actionable puffery as a matter of law. A determination of whether these statements are false or misleading (as opposed to non-actionable puffery), involves a fact-intensive inquiry that is inappropriate for resolution on a motion to dismiss. <u>See</u> <u>Horizon Healthcare Servs., Inc. v. Valley Health Sys.</u>, No. CV16545JLLJAD, 2016 WL 4770032, at *5 (D.N.J. Sept. 12, 2016) ("Determining whether the statements at issue are actually in violation of the Lanham Act as a matter of law is not properly before the Court at this time. Given the fact-intensive issues presented by these statements—i.e., are the statements false or misleading (as opposed to nonactionable puffing), and did they deceive and influence purchasing decisions?—the Court finds that it is not proper to formally resolve these issues at the motion-to-dismiss stage."). Accordingly, the Court limits its inquiry to "whether [UEC] has sufficiently pled a claim regarding the [D]efendant[s'] statements in their totality." <u>See</u> <u>L.A. Taxi Coop., Inc. v. Uber Techs., Inc.</u>, 114 F. Supp. 3d 852, 861 n.2 (N.D. Cal. 2015).

Accepting the allegations in the amended complaint as true, and drawing all reasonable inferences therefrom in favor of UEC, the Court finds that UEC has offered sufficient factual allegations to support a reasonable inference that the challenged statements constitute actionable misrepresentations under the Lanham Act. The allegedly false statements in question, derived from the March 15, 2017 Announcement, PDU Cables' website, PDU Cables' and Busway Solutions brochure, and PDU Cables' press release, concern the safety and efficacy of Busway Solutions' tap-off box as compared to UEC's STARLINE Tap-Off Box. Many of these advertised statements make explicit references to specific design features of Busway Solutions' tap-off box and draw implicit comparisons between the Busway Solutions' tap-off box and its sole competitor's tap-off box (UEC's STARLINE Tap-Off Box). Toro Co. v. Textron, Inc., 499 F. Supp. 241, 249-53 & n.23 (D. Del. 1980) (noting that claims concerning specific product attributes are not puffery.)

Indeed, several of these statements, especially those directed at claimed inadequacies with respect to the competitor's products, including the claim that "[t]ap-off box masts have always been a common culprit in busway track system failures," the claim that "[i]f the head is misaligned, it isn't uncommon to snap off the head during rotation," and the claim that "when older style-tap-off boxes fail it is typically because of the electrical mast," coupled with the claim that "[t]he Busway Solutions product improvement redesign resolved . . . these manufacturing weaknesses resulting in a tap-off box that delivers a more robust, safe and secure fault free load delivery," are not only specific in nature, but also objectively verifiable and comparatively measurable, and thus more akin to statements of fact than opinion or puffery. (Doc. Nos. 33-11-33-14.); see Castrol Inc., 987 F.2d at 945-46 (holding that claim that motor oil provides "longer engine life and better engine protection" is not mere puffery because "it is both specific and

measurable by comparative research"); <u>Guidance Endodontics, LLC v. Dentsply Int'l, Inc.</u>, 708

F. Supp. 2d 1209, 1244 (D.N.M. 2010) ("The Court finds that the bulk of these statements—

'safer,' 'more efficiently,' 'easier,' 'quicker'—are objectively verifiable and that a reasonable

consumer might believe that the seller had engaged in some sort of testing before making these

statements. They are therefore not puffing."); <u>Anunziato v. eMachines, Inc.</u>, 402 F. Supp. 2d

1133, 1140-41 (C.D. Cal. 2005) ("[A] specific factual assertion which could be established or

disproved through discovery. . . is not mere puffery.").

Accordingly, the Court will deny Defendants' motions to dismiss Count I of the amended

complaint.

### 2. Whether UEC has properly pled false advertising damages with requisite specificity.

Defendants also maintain that the amended complaint is devoid of sufficient factual

allegations to satisfy the fifth element of a claim of false advertising: the likelihood of

commercial injury. (Doc. Nos. 36 at 12; 38 at 8.)

The Court disagrees. To satisfy the fifth element of a false advertising claim, a plaintiff

must allege a likelihood of injury to a commercial interest in reputation or sales. <u>Lexmark Int'l,</u>

<u>Inc. v. Static Control Components, Inc.</u>, 134 S. Ct. 1377, 1390 (2014). Here, UEC's averment

that due to the unique electromechanical compatibility between UEC's STARLINE Track

Busway and Busway Solutions' tap-off box, "every sale of a Busway Solutions tap-off box

[would have likely] been a sale by UEC of UEC's STARLINE Tap-Off Box had Defendants not

engaged in false [and] misleading . . . statements" allows the Court to reasonably infer lost sales

resulting from the falsity of the advertisements at issue sufficient to withstand Defendants'

motions to dismiss. (Doc. No. 33 ¶¶ 110-12.) Accordingly, the Court will deny Defendants'

motions to dismiss Count I of the amended complaint, as it finds that UEC has adequately

asserted a likelihood of commercial injury.

B.  FALSE DESIGNATION OF ORIGIN IN VIOLATION OF SECTION 43(A) OF THE LANHAM
ACT (COUNT VII)

Count VII of the amended complaint, which sets forth a false designation of origin claim

against Busway Solutions and PDU Cables, is predicated on the following allegations:

176.    PDU Cables' e[-]mail advertisement on June 7, 2017 states that Busway
Solutions is offering a "two-year warranty on both the tap-off box <u>and the section
of Starline T5 busbar it is plugged into</u>."

177.    The false message conveyed by PDU Cables' e-mail advertisement on
June 7, 2017, to a customer in the industry is that [sic] PDU Cables and Busway
Solutions are an approved alternative source of UEC's STARLINE T5 Series
Track Busway products.

. . .

179.    PDU Cables' e-mail advertisement on June 7, 2017 does not give any
attribution to UEC as the owner, producer, and originator of the STARLINE T5
Series Track Busway Products.

180.    PDU Cables' and Busway Solutions' representation that it will offer a warranty
on UEC's STARLINE T5 Series Track Busway products (or any other UEC product is
unauthorized by UEC), will void UEC's customers' warranties . . . and is likely to cause
confusion, mistake, or deception with respect to the origin and/or sponsorship of UEC's
STARLINE products and the Busway Solutions tap-off box.

181.    PDU Cables' and Busway Solutions' representation that it will offer a warranty
on UEC's STARLINE T5 Series Track Busway products creates an unwanted association
between UEC and PDU Cables and Busway Solutions, and creates the misimpression that
PDU Cables and Busway Solutions are an approved alternative source of UEC
STARLINE T5 Series Track Busway products. . . .

182.    PDU Cables' and Busway Solutions' representation that it will offer a warranty
on UEC's STARLINE T5 Series Track Busway products and failure to attribute UEC as
the owner and originator of the STARLINE T5 Series Track Busway products constitutes
reverse passing-off and/or reverse-palming-off.

(Doc. No. 33 at 34-35.)

To state a false designation claim pursuant to 15 U.S.C. § 1125(a) of the Lanham Act, the plaintiff must allege the following:

> (1) that defendants used a false designation of origin; (2) that the use of the false designation of origin occurred in interstate commerce in connection with goods or services; (3) that the false designation is likely to cause confusion, mistake or deception as to the origin, sponsorship or approval of [plaintiff's] goods and services by another person; and (4) that [plaintiff] has been or is likely to be damaged as a result.

Huber, 28 F. Supp. 3d at 335 (citing AT&T Co. v. Winback & Conserve Program, Inc., 42 F.3d 1421, 1428 (3d Cir. 1994)).  Here, UEC proceeds on a reverse-passing-off theory of liability. "Reverse passing off, as its name implies, . . . [occurs when] [t]he producer misrepresents someone else's goods or services as his own."  Huber, 28 F. Supp. 3d at 335 (quoting Dastar Corp. v. Twentieth Century Fox Film Corp., 539 U.S. 23, 28 n.1 (2003)).

In support of their motions to dismiss, Defendants argue that UEC has failed to allege "an affirmative act or false representation in which PDU Cables has 'reversed passed off' UEC's product as that of its own or another."  (Doc. Nos. 36 at 17; 38 at 14.)[10]  Relying on Perkins School for the Blind v. Maxi-Aids, Inc., 274 F. Supp. 2d 319 (E.D.N.Y. 2003), Defendants principally contend that dismissal of the false designation of origin claim is appropriate because "PDU Cables makes no representation whatsoever that it or Busway Solutions are the T5 busway's owner or creator."  (Id.)  Defendants also insist that Busway Solutions' offer to cover UEC's busbar under its own two-year warranty does not create a likelihood of confusion, mistake, or deception as a matter of law.  (Doc. No. 36 at 17.)  In its oppositional brief, UEC responds that "[t]he false message conveyed by PDU's June 7, 2017 e-mail advertisement is that

---

[10] Busway Solutions has joined in the arguments raised in PDU Cables' motion to dismiss as it pertains to this claim.  (Doc. No. 38 at 14.)

PDU [Cables] and Busway Solutions are an approved alternative source of UEC's STARLINE T5 Series Track Busway products, which, of course, they are not." (Doc. No. 39 at 19.)

The Court agrees with Defendants that UEC has failed to state a viable claim for false designation of origin under the Lanham Act against Busway Solutions and PDU Cables. In Perkins School for the Blind, the plaintiff asserted that defendants engaged in "reverse palming off" of plaintiff's braillers in violation of the Lanham Act by selling its braillers as their own "without obtaining the permission or consent of the [p]laintiff, and without giving credit to the [p]laintiff or in any way acknowledging the trademark rights of the [p]laintiff." 274 F. Supp. 2d at 324. The court rejected that claim, reasoning that:

> Here, [plaintiff] fails to allege that the defendants attempted to pass off [its braillers] as their own. While the plaintiff alleges that defendants have substituted the plaintiff's warranty with [their] inferior . . . warranty, the complaint is devoid of any allegations tending to establish that the defendants misidentified the braillers and tried to pass off the braillers under their own name instead of the plaintiff's name. As such, the plaintiff has failed to allege a claim for reverse palming.

Id. at 325.

UEC's false designation of origin claim parallels that of the unsuccessful plaintiff in Perkins School for the Blind. The amended complaint does not allege, nor does the attached advertisement reflect, any attempt on the part of Defendants to substitute their names for UEC's with respect to the STARLINE T5 Busbar. As Defendants have correctly articulated, "[t]he mere fact that one party offers to warrant, repair, or replace another's product[, alone,] is not sufficient as a matter of law to establish a claim of false designation of origin." (Doc. No. 36 at 18.) Accordingly, the Court will grant Defendants' motion to dismiss Count VII of the amended complaint with prejudice.

C.    BREACH OF CONTRACT (COUNTS II & III)

Counts II and III of the amended complaint assert breach of contract claims against BTI premised on violations of the confidentiality and non-compete provisions set forth in the 2013 Agreement and the non-disparagement provision set forth in the subsequent Settlement Agreement.[11]  To state a claim for breach of contract under Pennsylvania law, the plaintiff must plead the following elements: (1) the existence of a contract, including its essential terms; (2) a breach of a duty imposed by the contract; and (3) resulting damages.  Lackner v. Glosser, 892 A.2d 21, 30 (Pa. Super. Ct. 2006).

### 1.    Breach of the 2013 Agreement (Count II)

In Count II of the amended complaint, UEC alleges that BTI breached the 2013 Agreement in three material respects; specifically, through:

> 144. disclosing confidential trade information to Busway Solutions and [Direct Power], including but not limited to information related to the design, safety, efficacy, pricing and marketing of UEC products[;]
>
> 145. disclosing UEC's confidential trade information to the USPTO, for its own benefit and the benefit of  Baldwin, Busway Solutions, and [Direct Power; and]
>
> 146. competing with UEC in the sale of its products, through the actions of its President, Baldwin, and Busway Solutions, when Baldwin and Busway Solutions started working on products competitive to UEC's products.

(Doc. No. 33 ¶¶ 144-46.)

In their motion to dismiss, Defendants Baldwin, BTI, Direct Power, and Busway Solutions seek dismissal of Count II of the amended complaint for failure to state a claim for breach of the 2013 Agreement.  (Doc. No. 38 at 9.)  Notably, Defendants do not dispute that UEC has alleged facts supporting the existence of a contract and resulting damages.  Rather,

_____

[11] The parties appear to agree, and the choice-of-law provisions set forth in the applicable agreements provide, that Pennsylvania law governs this dispute.

Defendants advance three arguments to support their position that UEC has failed to satisfy the second element of a breach of contract claim—the breach of a duty imposed by the contract.

First, Defendants argue that the amended complaint is devoid of allegations specifying "what confidential information was allegedly disclosed," and whether such information constitutes excludable "common knowledge," thereby leaving BTI to "speculate regarding the specifics of what UEC considers 'confidential information.'" (Id.) Second, as it specifically relates to Count II's averment that BTI breached the 2013 Agreement by disclosing confidential trade information to Busway Solutions and Direct Power, Defendants contend that UEC has failed to identify when those alleged disclosures took place, which they believe to be a significant omission given that the 2013 Agreement prohibits BTI from disclosing certain confidential trade information for a period of thirty-six months following its termination. (Id. at 10.) Third, Defendants argue that UEC has failed to allege facts from which a plausible inference could be drawn that BTI violated the non-competition clause of the 2013 Agreement by "directly or indirectly, enter[ing] into or in any manner tak[ing] part in, any . . . endeavor which competes with [UEC] in the sale of its merchandise" during the contract term. (Id.)

Having reviewed the arguments lodged by Defendants in support of their motion to dismiss in conjunction with the well-pleaded factual allegations contained in UEC's amended complaint, the Court finds that UEC has sufficiently alleged breaches of the confidentiality and non-competition clauses set forth in numbered Paragraphs 4C and 4D of the 2013 Agreement. As it relates to BTI's purported breach of the confidentiality clause, UEC has clearly alleged that BTI breached the confidentiality clause of the valid and enforceable 2013 Agreement by disclosing confidential trade information "related to the design, safety, efficacy, pricing and marketing of UEC products, as well as UEC's special business techniques, market analysis

forms, software programs, customer lists, and manufacturing contacts," to Busway and Direct

Power and in connection with the patent application process during the contract term "in

violation of paragraph[ ] 4C."[12] (Id. ¶¶ 46, 144.)  Indeed, UEC has identified what confidential

information was disclosed, to whom it was disclosed, when it was generally disclosed, and the

circumstances surrounding the disclosure that gave rise to the purported breach.

The Court is likewise unpersuaded by Defendants' challenges to the sufficiency of UEC's

allegations as to BTI's purported breach of the covenant not to compete.  In support of their

motion to dismiss, Defendants maintain that "UEC fails to state with any specificity an instance

where Baldwin or BTI worked on products that are competitive to UEC before UEC terminated

the agreement."  (Doc. No. 38 at 10.)  To survive a motion to dismiss for failure to state a claim,

the complaint must allege only enough "facts to raise a reasonable expectation that discovery

will reveal evidence of the necessary element[s]" of a particular cause of action.  Twombly, 127

S. Ct. at 1965.  Here, UEC's claimed breach of the non-compete clause is predicated on a theory

that BTI, through Baldwin and for the benefit of Busway Solutions, must have begun working on

inventions covered by the provisional patent application that were designed to compete with

UEC's tap-off box during the term of the 2013 Agreement because the provisional patent

application was filed merely three days after the 2013 Agreement ended.  Drawing all reasonable

inferences in favor of the non-moving party, the Court has no difficulty concluding that UEC has

asserted sufficient facts to raise a reasonable expectation that discovery may reveal evidence of

---

[12] Paragraph 4C of the 2013 Agreement provides that "[d]uring the term hereof and for thirty-six (36) months thereafter, the Sales Representative shall not disclose such confidential trade information . . . unless such information has already become common knowledge."  (Doc. No. 33-2 at 7.)  UEC's explicit reference to this provision in the amended complaint undercuts Defendants' position that the amended complaint does not specify when the alleged disclosures took place.  It is apparent from the amended complaint that BTI is alleged to have made the disclosures before the purported termination date of the Agreement.

BTI's involvement in the patentable invention during the term of the 2013 Agreement in light of the exceedingly short timeframe between the end of the 2013 Agreement and the date the provisional patent application was allegedly filed.

As noted above, Defendants also argue that Paragraph 4(D) of the contract, which restricts BTI from "directly or indirectly, enter[ing] into, or in any manner tak[ing] part in, any business, profession, or endeavor that competes with UEC during the term of the [A]greement," does not, by its unambiguous terms, prohibit BTI from "working on competitive products" that allegedly became the subject of the patent application filed after the termination of the 2013 Agreement. (Doc. No. 38 at 10.) Defendants urge the Court to dismiss Plaintiff's breach of contract claim because "Baldwin did not file the provisional patent application until after the agreement terminated," and thus, did not "engage or take part in any endeavor, which could conceivably be construed to violate the non-compete clause." (Id.) Defendants narrowly construe "endeavor" to exclude from its reach any alleged actions taken by Defendants in the course of preparing to file a patent application for a competitive product.

In the Court's view, the issue presented by Defendants in their motion to dismiss is one of contract interpretation controlled by principles of contract law. More specifically, resolution of this claim turns on the interpretation of the contractual term "endeavor" and whether the parties intended for the term to encompass the conduct complained of in the amended complaint.

Under Pennsylvania law, the touchstone of contract interpretation is ascertaining "the intent of the contracting parties, as objectively manifested by them." See Hullett v. Towers, Perrin, Forster & Crosby, Inc., 38 F.3d 107, 111 (3d Cir. 1994) (citing Mellon Bank, N.A. v. Aetna Bus. Credit, Inc., 619 F.2d 1001, 1009 (3d Cir. 1980)). "If the parties' 'intent can be cleanly extracted from the clear and unambiguous words that the parties have used, it is equally

conventional wisdom that they are held to those words contained in the contract.'" Allied Erecting & Dismantling, Co. v. USX Corp., 249 F.3d 191, 201 (3d Cir. 2001) (quoting Compass Tech., Inc. v. Tseng Labs., Inc., 71 F.3d 1125, 1131 (3d Cir. 1995)). The process of interpreting a contract under Pennsylvania law requires a court to make a preliminary inquiry into whether the contract is facially clear and unambiguous. See Ready Food Prods., Inc. v. Great N. Ins. Co., 612 A.2d 1385, 1387 (Pa. Super. Ct. 1992) ("The threshold determination of whether a writing is 'ambiguous' necessarily lies with the court."). Where the contract's terms are subject only to one reasonable interpretation, the court interprets the unambiguous contract as a matter of law. Pacitti v. Macy's, 193 F.3d 766, 773 (3d Cir. 1999). If, however, a contract provision is found to be ambiguous in that it is susceptible to two reasonable alternative interpretations, "the interpretation of the contract is left to the factfinder . . . to resolve the ambiguity in light of extrinsic evidence." Hullett, 38 F.3d at 111 (applying Pennsylvania law).

At this early stage of the litigation, and in the absence of fully-developed briefing on this point, the Court is simply not in a position "to determine whose interpretation of the relevant provision is correct or even whether the provision is sufficiently ambiguous to warrant referral to the fact-finder." Biovail Corp. Int'l v. Hoechst Aktiengesellschaft, 49 F. Supp. 2d 750, 775 (D.N.J. 1999); see Hullett, 38 F.3d at 111 ("[D]etermination [of] whether the language of an agreement is unambiguous may not be possible without examining the context in which the agreement arose."); Masciantonio v. SWEPI LP, No. 4:13-cv-0797, 2014 WL 4441214, at *6 n.5 (M.D. Pa. Sept. 9, 2014) ("[I]f a writing is not ambiguous, it is appropriate for a district court to resolve the issue of contract interpretation as a matter of law, but typically on summary judgment rather than a motion to dismiss.").

As a corollary to this finding, the Court's interpretation of a contract as a matter of law at the motion to dismiss stage is appropriate only when "the claims under which the plaintiff seeks relief are barred by the unambiguous terms of a contract attached to the pleading." Jaskey Fin. & Leasing v. Display Data Corp., 564 F. Supp. 160, 163 (E.D. Pa. 1983).  Applying such a standard here, the Court cannot conclude that Plaintiff's claims are barred by the unambiguous terms of the 2013 Agreement.  Indeed, the provision at issue broadly prohibits BTI from "directly or indirectly, enter[ing] into, or in any manner tak[ing] part in, any business, profession or other endeavor which competes with the Company."  Black's Law Dictionary defines endeavor as "[a] systematic or continuous effort to attain some goal; any effort or assay to accomplish some goal or purpose."  Endeavor, Black's Law Dictionary (10th ed. 2014); see Aleynikov v. Goldman Sachs Grp., Inc., 765 F.3d 350, 360 (3d Cir. 2014) ("[D]ictionaries are the customary reference source that a reasonable person in the position of a party to a contract would use to ascertain the ordinary meaning of words not defined in the contract.").  Clearly, the interpretation of endeavor offered by Plaintiff is consistent with the normal usage of the term and thus, gives rise to a facially plausible breach of contract claim sufficient to withstand Defendants' motion to dismiss. Consequently, the Court will deny Defendants' motion to dismiss UEC's claim for breach of the 2013 Agreement set forth in Count II of the amended complaint.

## 2.      Breach of the Settlement Agreement (Count III)

Defendants also move for dismissal of Count III of the amended complaint, which asserts a breach of contract claim against BTI stemming from an alleged violation of the Settlement Agreement entered into between the parties on July 9, 2014.  (Doc. Nos. 33 at 29; 33-4.)

Specifically, UEC claims that BTI breached Paragraph 3[13] of the Settlement Agreement when "Baldwin made disparaging and negative statements regarding unsubstantiated safety issues with UEC's STARLINE Tap-Off Boxes through advertisements with Busway Solutions, PDU Cables, and [Direct Power], in patent applications, and in direct communications with end-users/customers." (Doc. No. 33 ¶¶ 150-51.)

In their motion to dismiss, Defendants move for dismissal of Count III on the grounds that: (1) "UEC has not identified a single communication allegedly made by BTI, the party to the [S]ettlement [A]greement," that could be construed as disparaging, and (2) "the allegedly offending comments that UEC refers to were comments made in reference to UEC's products and not in reference to UEC as a company or to any particular individual," as contemplated by the disparagement clause. (Doc. No. 38 at 11.)

The Court finds Defendants' arguments unavailing. With respect to Defendant's first argument for dismissal, UEC "has clearly pled that all of the Defendants, led by Baldwin, acted in concert with each other to make false, misleading, and disparaging statements regarding UEC and its STARLINE products," through its allegation that "Baldwin, on his own behalf and working in concert with Defendants, including BTI, [Direct Power], and Busway Solutions, was involved in crafting at least some, if not all, of this content on the PDU Cables website and press release." (Doc. No. 33 ¶ 90.) With respect to Defendants' second contention as to this claim, the Court is unpersuaded that the alleged negative or disparaging comments do not fall within the scope of the Settlement Agreement. As the Court explained in the context of Defendants' similar challenge to UEC's alleged breach of the 2013 Agreement's non-compete clause, supra, the

_____

[13] Paragraph 3 of the Settlement Agreement provides that "[u]pon execution hereof, the parties hereto each agree not to make disparaging or negative comments regarding the other party hereto to any person or entity." (Doc. No. 33-4 at 3.)

Court is not in a position to conclude as a matter of law that UEC's interpretation of the non-disparagement clause of the Settlement Agreement as prohibiting BTI from making disparaging or negative comments directed at UEC's products is unambiguously foreclosed by the terms of the Settlement Agreement. Accordingly, the Court will deny Defendants' motion to dismiss Count III of the amended complaint.

D.     BREACH OF FIDUCIARY DUTY (COUNT IV)

Count IV of the amended complaint is captioned "Breach of Fiduciary Duty and Equitable Assignment ('517 Patent)" and is asserted against Defendants Baldwin and Busway Solutions. (Doc. No. 33. at 30.) Plaintiff alleges the following with respect to this claim:

> 155. Baldwin and BTI were fiduciaries to UEC by virtue of their commitment in the 2013 Agreement to "act as a [t]rustee of [UEC's] confidential trade information and [to] hold such information in trust and confidence for [UEC's] sole and exclusive use and benefit."

> 156. Baldwin and BTI breached their fiduciary duties to UEC in the first instance by filing for what became the '517 Patent in Baldwin's name, and in the name of Busway Solutions, but not in the name of UEC, and by otherwise disclosing confidential information owned by UEC in an effort to secure said patents to which UEC is entitled.

> 157. Baldwin and BTI breached their fiduciary duties to UEC in the second instance, acting through or on behalf of one or more Defendants, by creating a false association between Baldwin, BTI, and UEC and by using UEC's confidential trade information to misappropriate UEC's business opportunities . . . .

(Doc. No. 33 at 30-31.)

In its motion to dismiss, Defendants Baldwin, BTI, Direct Power, and Busway Solutions dispute, inter alia, that: (1) Busway Solutions did not owe any fiduciary duty to UEC because it was not a party to the 2013 Agreement; and (2) the amended complaint lacks factual allegations

supporting "behavior on the part of either party that would constitute a 'negligent or intentional' failure to act in good faith."[14]  (Doc. No. 38 at 12.)

The Court agrees with Defendants that the amended complaint fails to allege facts that give rise to a fiduciary relationship between UEC and Busway Solutions.  "In order to plead a violation of fiduciary duty or confidential relationship, [p]laintiff must show that such a relationship existed."  Harold v. McGann, 406 F. Supp. 2d 562, 571 (E.D. Pa. 2005).  Under Pennsylvania law, a fiduciary relationship exists "when one person has reposed a special confidence in another to the extent that the parties do not deal with each other on equal terms, either because of an overmastering dominance on one side or weakness, dependence or justifiable trust, on the other."  In re Clark's Estate, 359 A.2d 777, 781 (Pa. 1976) (citation omitted).  Typically, a fiduciary relationship may be established in one of two ways:

> First, it may be shown by demonstrating the existence of a relationship ordinarily known to be fiduciary as a matter of law, such as that between a "trustee and [beneficiary], guardian and ward, attorney and client, and principal and agent." Second, it may be established as a matter "of fact to be decided by evidence." The "disparity in position between the parties" is the key factor in determining whether a fiduciary-in-fact relationship developed between parties in an otherwise arm's-length business relationship.

Reginella Constr. Co., Ltd. v. Travelers Cas. & Sur. Co. of Am., No. 12–1047, 2013 WL 2404140, at *9-10 (W.D. Pa. May 31, 2013) (quoting Leedom v. Palmer, 117 A. 410, 412 (Pa. 1922)).  Here, it is entirely unclear from the amended complaint and briefing filed in connection with Defendants' motion to dismiss on what basis the alleged fiduciary relationship between UEC and Busway Solutions rests.  Because UEC has failed to allege any facts to support a

---

[14] The Court rejects Defendants' argument that the amended complaint does not provide adequate factual allegations indicative of a breach of a fiduciary duty.  As the Court explained, supra,  UEC clearly avers that Baldwin disclosed confidential trade information to the USPTO to secure the '517 Patent and created a false association between Baldwin, BTI, and UEC by using UEC's confidential trade information to misappropriate certain business opportunities with two perspective clients.

reasonable inference of the existence of a fiduciary relationship with Busway Solutions, the Court will grant Defendants' motion to dismiss Count IV of the complaint with leave to amend.

E.    TRADE DISPARAGEMENT (COUNT VI)

In Count VI of the amended complaint, UEC asserts a claim of trade disparagement against all Defendants.  Defendants collectively seek dismissal of Count VI of the amended complaint on the basis that UEC has failed to plead special damages with requisite specificity.[15] (Doc. Nos. 36 at 13; 38 at 14.)

 "A commercially disparaging claim—in contrast to a defamatory statement—is one 'which is intended by its publisher to be understood or which is reasonably understood to cast doubt upon the existence or extent of another's property in land, chattels or intangible things, or upon their quality.'" U.S. Healthcare, Inc. v. Blue Cross of Greater Phila., 898 F.2d 914, 924 (3d Cir. 1990) (quoting Menefee v. Columbia Broad. Sys., Inc., 329 A.2d 216, 220 (Pa. 1974); RESTATEMENT OF TORTS § 629 (1938)).  "Because the tort of disparagement protects against pecuniary loss, the elements of the cause of action are much more stringent than those for defamation." Zerpol Corp. v. DMP Corp., 561 F. Supp. 404, 409 (E.D. Pa. 1983);  see also Brooks Power Sys., Inc. v. Ziff Commc'ns, Inc., No. CIV.A. 93-3954, 1994 WL 444725, at *2

---

[15] Defendant PDU Cables also moves to dismiss Count VI on the grounds that the statements at issue are either non-actionable statements of opinion or are privileged.  (Doc. No. 36 at 14.)  The Court has previously rejected Defendants' argument that the challenged statements are mere puffery or statements of opinion.  To briefly address PDU Cables' alternative argument that the statements at issue are conditionally privileged under Section 649 of the Restatement (Second) of Torts, a competitor can claim the privilege under Section 649 when he makes an unduly favorable comparison of his own product as compared to that of his rival competitor so long as that comparison does not contain "false assertions of specific unfavorable facts regarding the rival competitor's things."  RESTATEMENT (SECOND) OF TORTS § 649 (1977).  Comment c to Section 649, which the Court finds instructive, analogizes the statements protected under Section 649 "to . . . 'sales talk' or 'puffing.'"  In light of its refusal to find at this stage of the litigation that UEC's false advertising claim constitutes nothing more than puffery, the Court declines to find that the privilege afforded under Section 649 attaches to the challenged statements and thus forecloses UEC from asserting its claim of commercial disparagement.

(E.D. Pa. Aug. 17, 1994) ("A claim for commercial disparagement protects economic interests related to the marketability of goods; defamation involves the reputation of persons, not products."). To maintain an actionable claim for commercial disparagement under Pennsylvania law, the plaintiff must allege facts supporting each of the following elements:

> (1) the statement is false; (2) the publisher either intends the publication to cause pecuniary loss or reasonably should recognize that publication will result in pecuniary loss; (3) pecuniary loss does in fact result; and (4) the publisher either knows that the statement is false or acts in reckless disregard of its truth or falsity.

KDH Elec. Sys., Inc. v. Curtis Tech. Ltd., 826 F. Supp. 2d 782, 806 (E.D. Pa. 2011) (citing Pro Golf Mfg., Inc. v. Tribune Rev. Newspaper Co., 809 A.2d 243, 246 (Pa. 2002)).

The defining hallmark of a trade disparagement claim is the requirement that a plaintiff plead pecuniary loss with considerable specificity. See Testing Sys., Inc. v. Magnaflux Corp., 251 F. Supp. 286, 290 (E.D. Pa. 1966) ("The necessity of pleading and proving special damages has been an integral part of the action of disparagement of property since it first developed as an extension of slander of title."). Direct pecuniary loss may be established through allegations demonstrating either a general diminution in sales or specific lost sales. Brooks Power Sys., Inc. v. Ziff Commc'ns, Inc., No. CIV.A. 93-3954, 1994 WL 444725, at *3 (E.D. Pa. Aug. 17, 1994) (citing Menefee, 329 A.2d at 220-21). To properly plead pecuniary loss based on lost sales, a "plaintiff claiming commercial disparagement must . . . set[ ] out 'the names of customers lost and financial loss resulting from the tort.'" KDH Elec. Sys., 826 F. Supp. 2d at 806 (quoting Bro-Tech Corp. v. Thermax, Inc., 651 F.Supp.2d 378, 416 (E.D. Pa. 2009) (citations omitted)). To successfully plead pecuniary harm grounded on a theory of general diminution of business apart from the loss of specific sales, courts in this Circuit, applying Pennsylvania law, have held that a plaintiff must allege:

facts showing an established business, the amount of sales for a substantial period preceding publication, and amount of sales subsequent to the publication, facts showing that such loss in sales were the natural and probable result of such publication, and facts showing the plaintiff could not allege the names of particular customers who withdrew or withheld their custom.

Synygy, Inc. v. ZS Assocs., Inc., 110 F. Supp. 3d 602, 619 (E.D. Pa. 2015) (quoting Forum Publ'ns, Inc. v. P.T. Publishers, Inc., 700 F. Supp. 236, 244 (E.D. Pa. 1988)).

Informed by these authorities, the Court finds that the amended complaint is devoid of factual allegations of direct pecuniary loss sufficient to plausibly state a claim of commercial disparagement. In reviewing Count VI's allegations, the Court observes that UEC asserts, in conclusory fashion, that the disparaging statements regarding the safety of UEC's STARLINE tap-off boxes "have resulted in the diminution of goodwill and lost sales with existing customers of UEC." Further, UEC posits that due to the "unique electromechanical compatibility between UEC's STARLINE Track Busway and Busway Solutions' tap-off box," and because the "Busway Solutions tap-off box is the only alternative tap-off box compatible with UEC's STARLINE Track Busway," "every sale of a Busway Solutions tap-off box was reasonably likely to have been a sale by UEC of UEC's STARLINE Tap-Off Box had Defendants not engaged in false, misleading and disparaging statements." [16] (Doc. No. 33 ¶¶ 106-12.)

Plaintiff's allegations do not allow for a plausible inference to be drawn that UEC suffered either general diminution of business or specific lost sales due to Defendants' alleged disparagement of its product line as is required to satisfy the pecuniary loss element of a commercial disparagement claim. Conspicuously absent from the amended complaint is a computational breakdown of the pre-disparagement and post-disparagement sales figures for

---

[16] To the extent UEC asserts damage to its reputation caused by the publication of a disparaging statement, "general loss of reputation or character is insufficient for recovery." Brooks Power Sys., Inc. v. Ziff Commc'ns, Inc., No. 93–3954, 1994 WL 444725, at *3 (E.D. Pa. Aug. 17, 1994).

UEC's STARLINE Tap-Off Boxes, which would allow the Court to infer pecuniary loss occasioned by diminution of business over the relevant period.  Compare with Hemispherx Biopharma, Inc. v. Asensio, No. 98-5204, 1999 WL 144109, at *11 (E.D. Pa. Mar. 15, 1999) (denying defendant's motion to dismiss plaintiff's claim of commercial disparagement because plaintiff alleged damages with sufficient detail by "present[ing] a high and a low point of its stock and a figure as to the decline in its capitalization").  To that end, UEC not only fails to plead a reduction in sales over a substantial period, but also fails to attribute the loss of sales to the disparaging publications.

Likewise, UEC offers no factual allegations of specific lost sales indicative of direct pecuniary loss.  The fact that UEC names Instor and Singleton Electric Company as examples of customers who had initially placed purchase orders for Busway Solutions' tap-off boxes, believing them to be UEC STARLINE products, is of no consequence, as UEC has effectively conceded that Instor and Singleton Electric Company "ultimately purchased UECs STARLINE Tap-Off Boxes," which undercuts a finding of pecuniary harm borne out by lost sales from those customers.  (Doc. No. 33at 23-25.)  Aside from naming Instor and Singleton Electric Company in the amended complaint, UEC neither identifies additional customers it lost as a result of Defendants' disparagement, nor approximates their value to UEC.  See Testing Sys., Inc. v. Magnaflux Corp., 251 F. Supp. 286, 290 (E.D. Pa. 1966) (dismissing plaintiff's trade disparagement claim with leave to amend for failure to properly allege special damages with requisite particularity by setting out the "names of his lost customers" and "figures [that show] how much he has lost financially," and noting that strict compliance with the pleading rule is appropriate given that "[b]oth the defendant and the plaintiff in this action are business organizations of some substance who are well aware of their present and potential sources of

business").   Accordingly, the Court will grant Defendants' motion to dismiss Count VI of the amended complaint for failure to state a claim for commercial disparagement, but will permit UEC the opportunity to amend this claim.

## IV.   CONCLUSION

For the foregoing reasons, the Court will grant in part and deny in part Defendants' motions to dismiss Plaintiff's amended complaint.  (Doc. Nos. 37, 39.)  The Court will deny the motions to dismiss Counts I, II, III, and V of the amended complaint.  The Court will grant the motions to dismiss Count IV asserted against Busway Solutions and Count VI of the amended complaint without prejudice to the right of UEC to amend these Counts.  Finally, the Court will grant the motions to dismiss Count VII of the amended complaint with prejudice.  An appropriate Order follows.